J-S25003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: B.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.E., MOTHER | |
| | No. 333 WDA 2022 |

Appeal from the Order Entered March 2, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000251-2021

BEFORE: BENDER, P.J.E., DUBOW, J., and KING, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: October 4, 2022**

S.E. ("Mother") appeals from the order dated February 28, 2022, and entered on March 2, 2022, in the Court of Common Pleas of Allegheny County Orphans' Court, which granted the petition of Allegheny County Office of Children, Youth and Families ("CYF") for termination of Mother's parental rights to her minor daughter, B.S. ("Child" or "the Child"), pursuant to sections 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1] After careful review, we affirm.

The orphans' court provided the following factual background and procedural history in its Pa.R.A.P. 1925(a) opinion:

> The Child was born [i]n December [of] 2012, at which time CYF received its first referral on the Child and family. The report was

---

[1] The parental rights of the natural father, J.S. ("Father"), were also terminated by order of court on the same date; however, Father did not appeal the termination.

regarding Mother's behavior, potential drug use, and concerns about how Mother intended to address her substance abuse and care for a newborn. CYF met with Mother at the hospital, noting that her behavior was somewhat erratic. Mother was discharged from [UPMC] Magee[-Womens Hospital] into Family Links, a residential drug and alcohol treatment center, with the Child in her care. At their follow up visit, Mother reassured the agency that she intended to complete the program. Without any immediate safety concerns for the Child, CYF closed out the referral in July 2013.

Less than a year later, CYF received another referral in June 2014, where it was reported that the Child, while in the care of … [F]ather and paternal grandmother, was found outside wandering around by herself. The Child was not yet two years old. Upon investigation, CYF learned that Mother was incarcerated. Father indicated he would take full responsibility for the [C]hild and without any additional concerns, CYF closed out the referral.

In August 2016, CYF received a referral involving an incident that occurred between Father's then-paramour and the Child. Father's then-paramour was named as a perpetrator of an alleged assault on the [C]hild. Between that point and October 2017, CYF received a few additional calls about the Child, which were screened out "because there wasn't [*sic*] any safety concerns, [and] nothing that we can do."

CYF was referred to the family on October 3, 2017, because Mother was allegedly seen in public under the influence of an unknown substance and was calling the Child names. CYF made efforts to provide assistance to Mother by offering an emergency POWER[3] evaluation and referrals for treatment. On December 22, 2017, CYF received a referral that Mother was arrested for allegedly using and selling drugs in the presence of the [C]hild, and that Father was also arrested and unavailable to care for the [C]hild.

[3] POWER stands for ["]Pennsylvania Organization for Women in Early Recovery[,"] and the organization provides, *inter alia*, drug and alcohol evaluations and referrals for treatment.

CYF removed the [C]hild via an emergency custody order on December 29, 2017[,] and filed a dependency petition pursuant to 42 Pa.C.S.[] §[]6302, "Dependent Child[,"] (1). At the adjudication hearing, Mother was incarcerated and[,] after

testimony, the [C]hild was adjudicated dependent and ordered to remain in placement. Included within the findings, this court noted that "Mo[ther] has a lengthy drug and alcohol history. Child was very happy to see … [M]other in the court room but [it] was also very clear that she was not happy with her [M]other['s] decision to steal and use drugs." Mother's goals included addressing her substance abuse issues, parenting and visitation, resolving her criminal matters, and locating housing. Mother was released from incarceration and reunited with … Father on or about February 22, 2018.

After the adjudication proceeding, the court held permanency review hearings on February 28, 2018[,] May 9, 2018[,] and July 11, 2018. During this time, the court found Mother to be making moderate progress while the [C]hild remained in care. At the July hearing, the court's findings noted that Mother said she had some medical issues, had been discharged from a drug and alcohol treatment center for non-compliance, was not attending urine[] screens through CYF, and had established housing with a roommate with a questionable criminal history.

In early October 2018, the South Strabane Police Department [was] called to Rack Room Shoes, which is a part of the Tanger Outlets located within their jurisdiction. Detective Michael Schielmeier responded to the report of an adult male and female that took twenty-six pairs of shoes and left the store without payment. Mother was identified as one of the perpetrators and she was charged with a felony of the third degree, retail theft, and a felony of the third degree, conspiracy. Detective Schielmeier testified at the contested termination proceeding that Mother had an outstanding bench warrant from those charges, over four years earlier, after failing to appear for proceedings after the preliminary hearing.

At the permanency review hearing on October 10, 2018, Mother was incarcerated and was no longer in regular contact with CYF. At the following permanency review hearing on February 13, 2019, the court made a finding that, "[t]his court is VERY concerned for the Child," as the Child's concerning behaviors were escalating. By the March 27, 2019[] permanency review hearing, Mother was at the Program for Female Offenders.[5] Mother continued to reside at this program at the following permanency review hearing on July 3, 2019.

[5] The Program for Female Offenders is a residential program that provides counseling, work experience, life skills, clerical training[,] and job search services for female offenders as they resolve their criminal matters.

By the October 8, 2019 permanency review hearing, Mother was reincarcerated, this time in Butler County and the court ordered that the [C]hild's concurrent goal in the case was adoption. Mother continued to be incarcerated when the court presided over the permanency review hearing on January 15, 2020.

In March 2020, Officer A.J. Yonek[] from the Harmar Township Police Department[] responded to an incident at the Days Inn Hotel for a female that overdosed. Upon arrival, Father told Officer Yonek that the Child was playing outside on the sidewalk and returned to the room only to start screaming that Mother was dead. Officer Yonek testified that EMS administered Narcan, reviving Mother, while he conducted an immediate search around the area where Mother had overdosed. Officer Yonek testified that "there was a powdered substance, several empty stamp bags of heroin, and numerous snorting straws" located on the back of the toilet. These items, according to the officer, were within reach of the Child. Charges were not filed at that time; however, the officer made a referral to CYF. The officer testified that Mother had an outstanding warrant out of the City of Pittsburgh for prohibited acts (drug paraphernalia), and EMS transported her to a local hospital for follow up. At the time of this incident, the Child was in the care of her paternal grandmother, who against court order, allowed unsupervised contact with Mother.

A goal change and permanency review hearing was held on July 29, 2020, at which time the court ordered no unsupervised contact between the Child and Mother, and directed CYF to explore all options for placement. Included in the findings, the court stated that, "Child recently made a disclosure that she has seen IPV[,[6]] drug use[,] and sexual abuse while with her parents." The order reflects that Mother was not in compliance with any of her family service plan goals and had made no progress towards alleviating the circumstances which necessitated the original placement.

[6] IPV stands for ["]intimate partner violence,["] also referred to as domestic violence.

Officer Kevin Cooney[] of the Shaler Township [P]olice [D]epartment[] responded to an incident involving Mother in July 2020. The officer conducted a traffic stop where Mother was

driving. Mother was not forthcoming with her name and gave an alias…. [D]uring the stop, the officer observed Mother tossing a crack pipe outside of the driver['s] side and was standing on a syringe. Officer Cooney testified that Mother provided correct information for an alias, and … he had no reason to believe she was being untruthful. He advised her that she would be charged with possession and tampering with evidence. He sent the summons to the alias, and that individual appeared in person at the police station after receiving said summons, at which point it was apparent that this was not the same individual that the officer had stopped. Upon obtaining the correct information for Mother, Officer Cooney sent the summons to Mother and made a referral to CYF. Officer Cooney testified that Mother later plead guilty to identity theft, false reports, and driving under suspension.

On October 28, 2020, the court's findings indicated that Mother had obtained new charges, was currently detained in the Allegheny County Jail, and that she was not in compliance with her family service plan goals and had not made any progress in remedying the conditions. The court order also noted that Mother had obtained new charges and was currently detained in the Allegheny County Jail. Mother's incarceration continued through the next permanency review hearing, on January 20, 2021; however, Mother was released by the following permanency review hearing on July 7, 2021.

Officer Peter Churberko[] from the Ross Township [P]olice [D]epartment[] responded to a reported theft at Sheetz on Babcock Boulevard in October 2021. Officer Churberko testified that he reviewed the video surveillance footage of a white female wearing a mask, who picked up and concealed two fidget spinners, and left the store entering a vehicle registered to Father. The investigation determined that the individual in the footage was Mother. As Sheetz wished to pursue charges against Mother, Officer Chuberko [*sic*] testified that he filed one count of retail theft, a felony 3, because of the dollar amount and the fact that [M]other's criminal history check found her to have thirty-four prior convictions for retail theft. Officer Chuberko [*sic*] testified that those charges had been adjudicated via a guilty plea.

At the permanency review hearing on October 6, 2021, the court found that the Child was doing well in the foster home[,] and she was in the 3rd grade with an Individualized Education Plan. Additionally, the court made findings that Mother had outstanding warrants from Butler [County] and Washington County.

> CYF filed petitions to terminate the birth parents' rights on November 19, 2021. At a hearing on December 3, 2021, the court appointed conflict counsel to represent the Child in the termination proceedings[] and scheduled a contested termination of parental rights proceeding on February 28, 2022. At the time of the termination proceeding, the Child was nine years old, had been adjudicated dependent and out of the care of Mother and Father for forty-eight months, and had resided in her pre-adoptive foster home for over a year and a half. Mother did not appear for the in-person contested termination of parental rights proceeding, instead appearing remotely.

Orphans' Court Opinion ("OCO"), 5/2/22, 2-10 (unnecessary capitalization, citations to record, and some brackets and footnotes omitted).

On March 2, 2022, the orphans' court entered an order granting CYF's petition to involuntarily terminate Mother's and Father's parental rights to Child pursuant to sections 2511(a)(2), (5), (8), and (b) of the Adoption Act. On March 22, 2022, Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). She now raises the following issues on appeal:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a)(2), (5), and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hild pursuant to 23 Pa.C.S. §[]2511(b)?

Mother's Brief at 6.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879

A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts

in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If

competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result. *In re Adoption of T.B.B.*,

835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights

is governed by section 2511 of the Adoption Act, which requires a bifurcated

analysis.

Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The

party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In this case, the trial court terminated Mother's parental rights pursuant to sections 2511(a)(2), (5), (8), and (b). We need only agree with the trial

- 8 -

court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S. [] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to

- 9 -

be without essential parental care, control or subsistence necessary for his physical and mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In the case of an incarcerated parent, this Court has stated:

[T]he fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children…. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

Thus, a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his … parental duties, to the child's right to have proper parenting and fulfillment of his … potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.

*In re B., N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004) (internal citations and quotation marks omitted). "Thus, the fact of incarceration alone neither compels nor precludes termination of parental rights. Parents must still provide for the emotional and physical well-being of their children." *In re*

- 10 -

***Z.P.***, 994 A.2d 1108, 1120 (Pa. Super. 2010). Moreover, we note that "[t]he cause of incarceration may be particularly relevant to the [s]ection 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were 'part of the original reasons for the removal' of the child." ***Id.*** (quoting ***In re C.L.G.***, 956 A.2d 999, 1006 (Pa. Super. 2008)).

Here, Mother claims that CYF failed to present clear and convincing evidence to support termination of her parental rights under section 2511(a)(2). Mother's Brief at 15-16. For instance, she contends there was insufficient evidence to conclude that Mother had not remedied her drug use. Mother avers that she sought treatment as directed and that CYF merely relied on her criminal history and the absence of drug screens to prove that she had failed to remedy the issue of her drug use. ***Id.*** at 16. She further states that there was insufficient evidence that her mental health prevented her from providing Child with basic care. ***Id.*** at 17. In support of her argument, Mother makes a vague reference to testimony of "Pressley Ridge witnesses" regarding "progress made by Mother and her ability to take redirection." ***Id.*** She attempts to minimize CYF's concerns regarding disclosures of domestic violence by Mother, noting that CYF admitted these concerns were based on "verbal disputes" or "disagreements" and nothing physical. ***Id.*** Finally, Mother takes issue with "the court's psychologist" for criticizing her for having a record of theft charges, speculating how that might affect Child, faulting Mother for discussing her medication with Child, and characterizing Mother as "not pro-social." ***Id.*** Mother argues that "the psychologist met [her] twice

- 11 -

and never reviewed the years of visitation logs prepared by those who repeatedly observed Mother and [Child] over longer periods." ***Id.***

Mother has failed to convince us that she is entitled to any relief on this claim. Contrary to her contention, we deem the record to contain overwhelming evidence of Mother's repeated and continued incapacity, abuse, neglect, or refusal to parent Child, and that the conditions which led to Mother's incapacity, abuse, neglect or refusal cannot or will not be remedied. As the orphans' court so aptly stated:

> Without doubt, … the record is replete with evidence proving, clearly and convincingly, that the statutory grounds to terminate Mother's parental rights existed. Mother did not successfully meet a single family service plan goal throughout the forty-eight months this case was open. Mother's goals remained the same throughout the case. This Child started life with a referral related to Mother'[s] substance abuse, and years later, that very substance abuse goal continues to exist. Moreover, Mother's inability to resolve her criminal lifestyle, which continued to exist at the time of the termination proceeding, also impacted her ability to make any forward progress. This [c]ourt, for the sake of the Child, gave Mother an extended period of time to try and make progress towards remedying the conditions that led to initial placement, and forty-eight months later, Mother is no closer. The conditions that existed at the outset continued to exist at the termination proceeding, this [c]ourt found Mother's testimony to lack credibility, and this [c]ourt lacked any confidence that Mother would be able to make progress on any of her goals in the immediate future.

OCO at 12-13.

More specifically, the orphans' court indicated Mother had goals to address her drug and alcohol use, to address any mental health concerns and follow through with recommended treatment, to demonstrate parenting and

- 12 -

visitation with Child, to resolve her criminal matters, and to obtain appropriate housing. *Id.* at 13-17. Concerns about Mother's drug and alcohol use extended as far back as Child's birth. Despite referrals on the part of CYF, Mother failed to successfully address this goal, nor did she "achieve any stretch of sobriety during the four years the case was open." *Id.* at 13. Regarding Mother's mental health, Mother participated in evaluations with the court-appointed evaluator, Dr. Patricia Pepe, "who noted that as recently as her April 2021 evaluation, … Mother was in need of 'intensive outpatient services … with somebody that has experience addressing antisocial personality traits[ a]nd[,] at the same time, it would have to be a dual diagnosis treatment to also address her history of addiction.'" *Id.* at 14 (quoting N.T. Hearing, 2/28/22, at 108).

Additionally, the orphans' court noted that, at the outset of the case, it ordered Mother be referred to a coached parenting program, which could facilitate both parenting instruction and supervision at visits. *Id.* Accordingly,

> CYF referred the family to the Arsenal program for these services, and visits were scheduled for every other Saturday. Initially, … supervised visitation occurred at the CYF North Regional Office. Once [Child was] placed in a Presley [*sic*] Ridge foster home in August 2020, visitation was scheduled and supervised through the treatment coordinator, Victoria Johnson. Ms. Johnson testified about some of her observations and concerns regarding the visitation. Ms. Johnson stated that Mother rarely canceled visits but was routinely twenty minutes late. She testified that Mother had "a history of making inappropriate comments during visitation with the Child, and they're not age appropriate." Ms. Johnson also explained that the agency established a "gift giving rule" because Mother started bringing lots of toys and gifts for the Child during visitation and the sheer volume of gifts overwhelmed the Child.

Ms. Johnson explained that the Child is "a very organized person, and all of these toys and presents took up so much space that the Child would actually have meltdowns after visits. She would panic because she had no room for these things. She didn't know where to put it [*sic*]. She had so much stuff. She started to get very overwhelmed." Ms. Johnson testified that her agency instituted this rule to encourage the Child to engage with her Mother with quality time during the visits, and not spend the entire visit focusing on a toy, and [to] still allow Mother the opportunity to provide gifts at appropriate times, such as the holidays or through special requests. Despite Mother['s] being aware of the rule, Ms. Johnson stated that Mother would find ways to sneak gifts into the Child's bag, which in turn would "make the Child feel horrible after visits because she would see these items in the bag and give them to staff, because the Child … worried she would get in trouble if … she was caught with these items." Four years into the case, … Mother had not established herself as safe enough for unsupervised visitation. At the time of the termination proceeding, Ms. Johnson, the CYF caseworker[,] Wayne Noel, and the [c]ourt[-]appointed evaluator, Dr. Patricia Pepe, all testified that they [would have] significant concern[s] if the Child was to have any unsupervised contact with Mother.

*Id.* at 14-16 (brackets in original and citations to record omitted).

As for Mother's goal to resolve her criminal matters, the orphans' court relied on the testimony of Mother's Butler County Probation Officer, Heather Evanko. *Id.* at 16.

Ms. Evanko testified that Mother was assigned to her unit shortly after a March 2020 sentencing[,] and [that] during her processing and background research for Mother[,] … she "found there were over 50 magistrate warrants for her arrest…." Ms. Evanko testified that mail sent to Mother came back unclaimed, and that Mother was given two opportunities to report, which she failed to do. Ms. Evanko reached out to Mother's Allegheny County Probation Officer, Megan St. Joxe, in an attempt to gain compliance. At the time of the contested termination proceeding, Ms. Evanko testified that Mother had three outstanding warrants, two from Butler County and one from Washington County.

*Id.* (citations to record omitted). The orphans' court found that "Mother did not address this goal with any success…." *Id.* Moreover, the court determined that Mother also failed to reach her housing goal, as any housing she may have been residing at during the time of the termination proceeding "lacked stability due to Mother's criminal issues." *Id.* at 17. *See also id.* (indicating Mother had outstanding warrants for her arrest at the time of the termination hearing).

Finally, the orphans' court noted that Child is doing well in the foster home. *See id.* (referencing the testimony of CYF caseworker, Renee Taddy, that Child has a "very comfortable relationship" with the foster family and that she "is very happy there. She's comfortable, and she's safe there"). *See also id.* at 18 (noting that counsel for Child indicated Child "would like to go back home if that was possible but that if she could not go back home, she would like to be adopted"). The court opined:

> Our Superior Court has noted that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future." *In the Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Mother could not or would not … remedy the conditions and termination was in the best interests of the [C]hild, as … evidenced in the record. Additionally, … this [c]ourt lacked any confidence that Mother could or would quickly progress towards remedying the conditions in the foreseeable future.

*Id.* We deem the orphans' court's decision to terminate Mother's parental rights pursuant to section 2511(a)(2) to be well-supported by the record, and we discern no abuse of discretion.

As for its analysis under section 2511(b), Mother claims that the record does not support the court's determination that termination of her parental rights best serves the needs and welfare of Child. Mother's Brief at 21. Rather, Mother argues the record clearly established that Child "loves, wants, and needs Mother and derives necessary benefits from her relationship with Mother." *Id.* In support of her argument, Mother points to testimony from Dr. Pepe and Ms. Johnson recognizing that Child loves Mother and wants to live with her. *Id.* at 20. Again, Mother has failed to convince us that she is entitled to relief on this claim.

Significantly, the orphans' court acknowledged:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the Court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 533-[]36 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial [c]ourt's decision to terminate parents' parental rights was affirmed where [the c]ourt balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' [c]ourt must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

OCO at 19 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).

In reaching its decision to terminate Mother's parental rights pursuant to section 2511(b), the orphans' court considered the testimony of Dr. Pepe, who it notes had the opportunity to evaluate and interact with both Mother and Child over several years, allowing Dr. Pepe "a longitudinal view of their relationship and the impact Mother had on the Child's developmental, emotional, and physical needs and welfare." *Id.* at 19-20. Dr. Pepe indicated that throughout her evaluations she saw the implications of "antisocial parents." *Id.* at 20. She explained: "Basically, it's very disruptive for children because the [antisocial] behavior can help the child be deceitful, irresponsible, unreliable, [and] incapable of feeling guilty. So essentially, the child's cognitive and social and emotional development are impacted." *Id.* (quoting N.T. Hearing at 73). Dr. Pepe further stated that, "when she first evaluated the Child[,] she had a superior-level IQ but 'was not exhibiting age-appropriate or developmentally appropriate functioning.'" *Id.* (quoting N.T. Hearing at 78). Dr. Pepe concluded that Child's functioning was directly impacted by the antisocial functioning of her parent, as "her mother was in and out of her life." *Id.* (quoting N.T. Hearing at 78).

Based on her individual evaluation of Mother and an interactional evaluation between Mother and Child, as well as an interactional evaluation between Child and her foster parents, Dr. Pepe testified that

> the foster family has provided [Child] with "positive structure" as well as "realistic expectations, where positive functioning and school was promoted, pro-social skills were promoted[,] and there was a clear structure with clearly identified expectations and consequences." … [I]t was "wonderful to see" the progress that

the Child had made in this foster home and that the Child was "finally functioning at an age-appropriate level."

Conversely, … Mother clearly loves Child but Mother's thirty[-]year history of addiction has clearly impacted her ability to prioritize Child…. Mother was incarcerated for the first few years of the Child's life, that pattern continued…, and Mother has not been able to provide the Child with the stability she needs.

*Id.* at 20-21 (citations to record omitted). Additionally, Dr. Pepe testified that permanency through adoption is very important for Child and that she would be concerned if Mother was to have unsupervised contact with Child because of Mother's inability to model appropriate behavior. *Id.* at 21. In Dr. Pepe's opinion, the emotional bond between Mother and Child was not beneficial to Child and it would be in Child's best interest to remain in her current foster home. *Id.* at 22.

The orphans' court opined:

With the grounds firmly established, this [c]ourt found the testimony and evidence clearly and convincingly proved that termination best served th[e] Child's needs and welfare. This [c]ourt acknowledges that Mother loves and cares for the Child; this is not in dispute. It is also not in dispute that the Child, in her own way, cares for Mother as well. However, this [c]ourt agrees with Dr. Pepe's expert opinion that termination best meets the Child's overall developmental, emotional, and physical needs and welfare and any potential harm caused by severing the relationship would be mitigated by the stability, safety, and consistency within the Child's foster home…. [S]evering any bonds with Mother would not cause extreme emotional consequences for the Child.

*Id.* at 22-23.[2]  As there is competent evidence in the record that supports the orphans' court's credibility and weight assessments regarding Child's needs and welfare, we conclude that the court did not abuse its discretion in terminating Mother's parental rights under section 2511(b).  *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (stating that appellate courts must defer to the trial court regarding credibility determinations and weight assessment, so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion).

Accordingly, we affirm the order involuntarily terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Order affirmed.

---

[2] We note that counsel for Child agrees with the orphans' court's assessment that termination of Mother's parental rights would best serve Child's developmental, physical, and emotional needs and welfare.  Child's Brief at 9.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  10/04/2022